GARRISON, Judge.
Plaintiff, the executrix of the estate of' Manuel Molero, filed this lawsuit against the defendants, Perry R. Bass et al, for payment of overriding royalties which are allegedly due according to the terms of a contract between S.W. Richardson and Manuel Molero dated August 16, 1945. This contract reads as follows:
“August 16, 1945
It is agreed between S.W. Richardson and Manuel Molero that if during the period that the Delacroix Corporation-Coastal Corporation-S.W. Richardson Lease is in force and effect by production or other wise, [sic] the said Richardson obtains oil, gas or mineral leases in the Parishes of Plaquemines or St. Bernard, Louisiana, East of the Mississippi River, from the State of Louisiana or other owners, said Richardson, upon execution and recordation of any of such leases, shall assign to Manuel Molero an overriding royalty out of the oil, gas or other minerals produced under such leases so obtained, figured as follows:
The lease or contract royalty for such leases so obtained shall be deducted from a maximum overall royalty of three-sixteenths ([3]/i6ths), and the difference if any shall be the overriding royalty to be assigned Manuel Molero.
It is agreed that operations if any on the premises covered by any of the leases herein mentioned and the extent and duration thereof as well as the preservation of the leasehold by rental payment or otherwise, shall be solely at the will of Richardson.
This agreement on the part of S.W. Richardson to assign royalties shall remain in force and effect only so long as the Delacroix Corporation-Coastal CorporationS.W. Richardson Lease remains in full force and effect.
7s7 S.W. Richardson S.W. Richardson,
Assignor
7s7 Manuel Molero Manuel Molero, Assignee”
The alleged consideration for this contract was that Molero would use his influence in St. Bernard and Plaquemines Parishes in order to assist Richardson in acquiring leases in these areas. Pursuant to this agreement, Mr. Molero received 360 assignments of overriding royalty payments between the years 1945 and 1949. Mr. Mole-ro received no royalty payments after 1949.
In 1950, Mr. Molero wrote a letter to Mr. Richardson demanding payment of overriding royalties from the producing areas on which Richardson had been assigned leases by Humble Oil Company in 1948. Richardson did not pay Molero overriding royalties on these leases or on the Cox Bay area leases acquired by the State of Louisiana and, eventually, this suit was filed fourteen years later in 1964 by the executrix of the estate of Manuel Molero.
Specifically, the plaintiff asks to be recognized as the owner of overriding royalty rights in the Pointe a la Hache field and in the Cox Bay area field. Assignments of many of the leases in the Pointe a la Hache area to Richardson from Humble Oil were obtained during the existence of the Delacroix Corporation-Coastal Corporation lease (the agreement of August 16,1945) and are still maintained by production. In this assignment, Richardson acquired a 65% interest in these leases assigned from Humble and Humble acquired a 35% interest in Richardson leases.
The key question at trial was whether the agreement of August 16, 1945 covered all leases obtained by Richardson or whether it only included leases which were obtained from a landowner. Plaintiff claims that the agreement covered all leases obtained by Richardson and that Richardson changed his interpretation of the contract and redefined his own obligations because of production in his leases in the Pointe a la *932 Hache area acquired from Humble by assignment.
As for the Cox Bay area, these leases were acquired from the State of Louisiana by Richardson and Bass and contained a ¾6 royalty; therefore, Molero received no overriding royalty because the 1945 agreement specified that the overriding royalty to Molero would be any difference between the lease royalty and ¾6 royalty. Plaintiff claims that these leases could have been obtained for a much lower royalty and that Richardson’s negotiation of a royalty of ¾6 constituted an effort to defraud Molero of his alleged right to an overriding royalty.
The defendants argue that the agreement covered only leases obtained from landowners such as the State of Louisiana. The defendants also argue that the partnership agreement[1] in 1949 between Richardson and Bass did not provide for the assumption of' debts or obligations for which Richardson had previously contracted. Additionally, Perry Bass testified at trial that, he was totally unaware of the 1945 agreement until suit was filed in 1964.
The defense also argues that laches is applicable in this case because the plaintiff had no excuse for the lengthy delay in filing suit and because all of the principals[2] to the 1945 agreement died prior to the filing of the suit. The defense also filed numerous peremptory exceptions which were overruled by the trial judge because of the reasoning by which he chose to resolve this case.
The trial judge dismissed plaintiffs suit because of his interpretation of the 1945 agreement. He made the distinction between leases originally -obtained from landowners and leases obtained by assignment from„ existing lessees. According to the judge, because the State of Louisiana is always a lessor» the term “other owners” is interpreted to mean other landowners or lessors. The judge held that Richardson had fulfilled any obligations to Molero under the agreement and did not owe overriding royalty payments on the Pointe a la Hache and the Cox Bay leases because the former was obtained by assignment from an existing lessee and the latter provided for a s/i6 royalty thereby leaving no difference between the lease royalty and ¾6.
Additionally, the trial judge held that because no override was paid to Molero following the demand letter of 1950 and because no subsequent agreement was made between the parties, it follows that Molero’s inaction demonstrates his acquiescence in this interpretation of the contract because there was no other discernible reason- for such a delay. The trial judge found that Richardson had no obligation to pay overriding royalties to Molero on assignments of previously granted leases and that no evidence was presented to support plaintiffs allegation that the s/ie royalty on the Cox Bay leases was negotiated in order to defraud Molero of his alleged rights under the 1945 contract.
A question was raised at trial regarding a small number of leases obtained by brokers of Richardson in which Molero was granted overrides in a situation contrary to defendant’s and the trial judge’s interpretation of the contract. The trial judge concluded that these brokers were agents of Richardson and that the payment of overrides to Molero on these leases was in fulfillment of the 1945 contract. The judge also noted that these few payments did not constitute a consistent pattern of conduct on Richardson’s part. The trial judge specifically concluded that this action had not prescribed and that laches was not applicable. Plaintiff now appeals this judgment.
*933 As for the issue of whether overriding royalties are due to Molero from the Cox Bay leases, we agree with the trial judge that the record does not support the plaintiffs claim of fraud. According to Civil Code Article 1848:
“Fraud, like every other allegation, must be proved by him who alleges it, but it may be proved by simple presumptions or by legal presumptions, as well as by other evidence. The maxim that fraud is not to be presumed, means no more than that it is not to be imputed without legal evidence.”
The plaintiff in this case has failed to provide any evidence to substantiate the allegation that the Cox Bay leases were negotiated for a three-sixteenths royalty in order to defraud Molero of his right to an overriding royalty on these leases. In that regard, we find for the defendants. In other particulars, we do not agree with the court below.
If the agreement between Richardson and Molero is viewed in its proper context as an oil and gas contract, the primary issue of this case becomes less mysterious. That issue concerns, to use the trial judge’s phrase, the matter of the “previously obtained leases”.
It is well established that the acquisition by an independent producer of a lease from an oil company is customarily described as a “farmout”.[3] The 1945 contract does not provide for any exclusion of overriding royalty payments to Molero in the case of farmouts. Yet such an acquisition, with subsequent drilling by the independent producer, is common enough that if this were intended to be excluded, the contract specifically would have excluded it. Richardson’s attorneys would simply have inserted a clause limiting Molero’s royalty interest to circumstances where Richardson had obtained leases from land owners.
At the same time, the contract does not limit Molero’s rights to the overriding royalty only to leases from the State and owners of land. It does not, in fact, even mention landowners but only lease owners. Thus, meaning that whenever Richardson acquired a lease from an owner of a lease, an overriding royalty interest would go to Molero. This necessarily would include not only leases owned by oil companies, as well as land owners, but even leases owned by brokers.
To ignore the explicit oil and gas context in which this contract was made and apply the “ejusdem generis” rule of interpretation, as the trial judge did, was clearly erroneous. It is more relevant to apply the plainly intended meaning of this petroleum industry instrument than to attempt to apply a rule antecedent to the development of oil drilling and more applicable to other more conventional agreements. The plainly intended meaning, so examined, is that the concept of “previously obtained leases” was of no significance here and had no exclusionary effect as to Molero. Accordingly, this contract clearly appears to refer to acquisitions by Richardson of leases from any other mineral lease owners.
Richardson, the independent producer, demonstrated that this was his view and that he intended for the contract to apply to all owners of leases, when — prior to the development of the Humble situation — he actually made overriding royalty payments to Molero after acquiring leases (as a sub-lessee) from other lease owners who were not land owners. It appears that only after the surfacing of the Humble problem — with regard to his relationship with Molero — did Richardson change this demonstrated interpretation that it made no difference whatsoever from whom he obtained the leases.
That conclusion accords with the evaluation of the contract as an oil and gas instrument. As an independent oil producer, *934 Richardson necessarily was in the business of drilling for oil not only on leases obtained from landowners but from major companies as well. Richardson, a Texan, wanted to come into Louisiana and obtain oil. Molero had lived in Louisiana, and had been in the oil business there for many years, and would provide added access to Louisiana oil. Richardson would not likely have been greatly concerned, when the contract was made, about anything more than such access to Louisiana oil — and consequently, the contract applied no constrictions or limitations, as to Molero’s overriding royalty, based upon the mode by which Richardson obtained that oil.
In the oil and gas business, the producer customarily draws up any contracts between him and the supplier to him of special services, who in return receives an overriding royalty interest. More particularly, in this case, it is apparent that Richardson’s attorneys drew up the subject contract for him. Consequently, any ambiguity with regard to the establishment of Molero’s overriding royalty must be given an interpretation favorable to Molero. LSA-C.C. art. 1957, 1958.[4]
In sum, with regard to the interpretation of the 1945 contract, this court finds compelling and adopts the reasoning of the plaintiff.
As for the alleged delay by the plaintiff in filing this suit, we affirm the holding of the trial court that the action was not prescribed and that the common law concept of laches is not applicable. However, we do not agree with the trial court’s conclusion that the described “inaction” demonstrates any interpretation placed upon the contract by the parties, particularly by Molero and anyone inheriting his rights. Sufficient activity existed to make explainable Molero’s delay in initiating litigation and, in any case, the delay itself in the absence of laches (which is not applicable) could not be given the effect of divesting the plaintiff of the rights claimed in this action. However, even in the absence of such activity, the delay itself would serve as evidence only of the subjective contemplation by Molero (and his successor) concerning his rights growing out of the 1945 contract.
The 1950 letter to Richardson and Bass from Hugh Wilkinson, Sr., (Exhibit 68) making demand for overriding royalties due Molero (under the Pointe a la Hache Field leases) indicates clearly enough Mole-ro’s assertion of his rights under the contract. This occurred within three months of the first indication that Richardson was not going to continue to honor the contract fully. Until the Humble transaction occurred in the autumn of 1949, Richardson not only had so honored the contract but had never failed to provide Molero with his override instrument on previously obtained leases.
It was only two months following Mole-ro’s demand that Richardson negotiated away the full ¾6⅛ royalty in acquiring the Cox Bay Field leases. In the autumn of 1951, however — before drilling a new well just north of the Pointe a la Hache field— Richardson executed with Molero a compromise (although restricted to Molero’s rights under the lease obtained in that localized area.) To Molero, this had to indicate the likelihood of obtaining a reasonable compromise on the general claim he had made with regard to the Pointe a la Hache field leases. There is no formula by which it can be determined from the outside what period of time is unreasonably long to anticipate such a compromise.
Molero had laid claim to his rights once and for all in his attorney’s letter in 1951. Furthermore, there was the additional factor that he was President of the Dela *935 croix Corporation and in the years that followed, Richardson was drilling wells at a number of locations on the Delacroix land. The record, with regard to this and a number of other instances, supports the conclusion that it was reasonable to delay and avoid the acrimony of a personal suit against Richardson. Even after Molero’s death in 1962, attorneys for the defendants sought to obtain from Molero’s widow a quitclaim deed concerning his claim.
In the final analysis, whenever Richardson acquired a lease described in the contract, Molero acquired a real right as against Richardson (and his successors) as in this suit.[5] Because Molero’s real right, i.e. the overriding royalty interest, was defined by LSA-R.S. 9:1105 as incorporeal immovable property, this action was only subject to thirty years prescription.[6] LSA-C.C. art. 3548. Therefore, because this lawsuit was filed long before thirty years had elapsed from the time plaintiff’s overriding royalty payments were discontinued, the so-called delay is not a factor in this suit.
Furthermore, we find that the overriding royalty interest due Molero under the 1945 contract was neither constricted nor affected by the partnership formed between Sid Richardson and Perry Bass nine months later nor by the transfer, after Richardson’s death, of the Richardson and Bass interest to the Bass Partnership nor by the acquisition of any successor to those interests. LSA-C.C. art. 2015.[7]
Even under the reasoning of the trial court, the overriding royalty rights relative to the twenty-seven Pointe a la Hache leases described by plaintiff, not having been acquired by “previously obtained leases” must be awarded to the plaintiff. Nineteen of these leases were obtained directly by the partnership of Richardson and Bass and eight were acquired in the name of Perry Bass prior to the dissolution of the partnership.
Furthermore, we find that in all other instances, as well, where the leases were assigned by landowners and other mineral lessees to the defendants, or their predecessors, the contract being applicable, the overriding royalty interest due plaintiff by defendants must be awarded to plaintiff. We do not, however, find this to be the case where the contract royalty constituted a full three-sixteenths interest.
For the reasons stated above, we affirm the portion of the trial court judgment which states that the plaintiff is not entitled to an overriding royalty on the Cox *936 Bay leases. However, we reverse the trial court’s decision as to the Pointe a la Hache leases and we hold that Molero and his heirs should have been recognized as the owner of an overriding royalty interest on these leases as stipulated in the agreement of August 16,1945. Therefore, we remand this case to the district court for action consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
ARMSTRONG, J., concurs in part and dissents in part.

. In 1949, a partnership agreement was formed in which Richardson retained a 75% interest and his nephew, Perry Bass, acquired a 25% interest. The partnership of Richardson and Bass existed until Richardson’s death in 1959 at which time Bass Brothers Enterprises acquired 100% of' the'- stock from the Sid Richardson Foundation-through legacies from the estate of Sid W. Richardson'. These Bass companies also acquired Richardson’s interest in the Cox Bay leases and in the Pointe a la Hache leases.

. The principals to the 1945 agreement were S.W. Richardson, Manuel Molero, and J.E. Hill who negotiated the agreement on behalf of Richardson.

. LSA-C.C. art. 1957 states:
“In a doubtful case the agreement is interpreted against him who has contracted the obligation."
LSA-C.C. art. 1958 states:
"But if the doubt or obscurity arise for the want of necessary explanation which one of the parties ought to have given or from any other negligence or fault of his, the construction most favorable to the other party shall be adopted, whether he be obligor or obligee.”

. LSA-R.S. 9:1105 which was in effect at the time of the confection of the 1945 agreement stated:
"Oil, gas and other mineral leases, and contracts applying to and affecting such leases or the right to reduce oil, gas or other minerals to possession, together with the rights, privileges and obligations resulting or flowing therefrom, are hereby defined and classified as real rights and incorporeal immovable property, and may be asserted, protected and defended in the same manner as may be the ownership or possession of other immovable property by the holder of such rights, without the concurrence, joinder or consent of the landowner, and without impairment of rights of warranty, in any action or by any procedure available to the owner of immovable property or land.”

. Although thirty years prescription was in effect at the time that plaintiffs cause of action arose, the Louisiana Mineral Code, which became effective on January 1, 1975, states that an interest created out of the mineral lessee’s interest, e.g. an overriding royalty interest, is dependent on the continued existence of the lease and is not subject to the prescription of nonuse. LSA-R.S. 31:126. Therefore, either under the old law or the new law, the plaintiffs action had clearly not prescribed.

.Civil Code Article 2015 states:
"Not only servitudes, but leases and all other rights, which the owner had imposed on his land before the alienation of the soil, form real obligations which accompany it in the hands of the person who acquires it, although he have made no stipulation on the subject, or they be not mentioned in the act of transfer. The purchaser may, if the circumstances permit it, have relief against the seller for concealment of such charges; but the law establishes the rule that no one can transfer a greater right than he himself has, except where the neglect of some formality required by law has subjected the owner of the real incumbrance to a loss of his right, in favor of a creditor or bona fide purchaser.”